**Hiram Ben JOHNSTON and Dorothy Johnston, Appellants,**

v.

**Glenn F. CONGER, Respondent.**

**No. WD 45965.**

Missouri Court of Appeals,
Western District.

March 23, 1993.

Motion for Rehearing and/or Transfer to Supreme Court Denied April 27, 1993.

Application to Transfer Denied
June 29, 1993.

John H. Norton, Norton & Norton, Kansas City, Jerry J. Rellihan, Raytown, for appellants.

Richard F. Modin, Miller, Dougherty & Modin, Kansas City, for respondent.

Before BERREY, P.J. and ULRICH and SMART, JJ.

ULRICH, Judge.

Hiram Ben Johnston and Dorothy Johnston appeal from the judgment, following jury verdict, in favor of Glenn F. Conger in an action brought by the Johnstons for the personal injuries sustained by Mr. Johnston as a result of a fall from a ladder on Mr. Conger's property. The Johnstons also appeal the order of the trial court overruling their motion for a new trial. The Johnstons allege that the trial court erred (1) in overruling their motion in limine and overruling their objections to the testimony of Mr. Conger's expert witness, Dr. Victoria Cook, and (2) in submitting Mr. Conger's comparative fault instruction to the jury. The judgment is affirmed.

On April 4, 1987, Mr. Johnston, Mr. Johnston's son, Mr. Conger, and Mr. Conger's son assembled at Mr. Conger's home to install guttering. Mr. Johnston, who had thirty years of experience doing guttering work, had offered to install guttering free of charge on Mr. Conger's house. Mr. Conger, Mr. Johnston's next-door neighbor for approximately sixteen years, had no expertise in guttering work.

Mr. Johnston supervised the men in their work. Mr. Johnston's son climbed onto the roof to mark the rafters; Mr. Conger's son used a stepladder to help him in that process. Mr. Johnston placed an extension ladder against the house, with the top of the ladder resting against the fascia board. Because the ground under the ladder sloped slightly, Mr. Johnston asked Mr. Conger to place a small board under the right leg of the ladder. Once the board was in place, the ladder was level with the ground.

Mr. Conger estimated that the ladder was placed 2¼ inches above the bottom of the fascia board. Mr. Johnston stated in his deposition that the top of the ladder rested "maybe four, four and a half inches" on the fascia board but admitted at trial on cross-examination that the top of the ladder could not have made contact with the fascia board higher than 1½ inches from the bottom of the board. He stated that the ladder should have been 4 to 4½ inches above the bottom of the board and that if the ladder had only made contact one inch above the bottom of the fascia board, the ladder would not have been safe to climb. According to Mr. Johnston, if the ladder had been only one inch above the bottom of the fascia board, the top of the ladder would have fallen towards the house when climbed.

When Mr. Johnston began to ascend the ladder, Mr. Conger's son was approximately twenty-four feet away from him, and Mr. Johnston's son was on the roof about four feet away. Mr. Conger was standing on the ground on the right side of the ladder. Mr. Johnston testified that either before he started climbing the ladder or when he had reached the second ladder rung from the ground, he asked Mr. Conger to get behind the ladder and put both of his feet on the ladder to hold it. Mr. Conger testified that Mr. Johnston did not ask him to hold the ladder. Mr. Conger believed he needed to hold the ladder, however, because he thought that the ladder might slide to the right. Partially facing the ladder and partially facing the house, Mr. Conger remained on the right side of the ladder and held the right rail of the ladder with both hands. Mr. Johnston stated he did not check to make sure Mr. Conger was holding the ladder as he had directed before he continued up the ladder.

Neither Mr. Johnston's son nor Mr. Conger's son could recall hearing Mr. Johnston ask Mr. Conger to hold the ladder. Mr. Conger's son testified that before Mr. John-

ston began to climb the ladder, he noticed that only about one inch of the top of the ladder was actually on the fascia board. He stated that he told Mr. Johnston, "That doesn't seem safe to me. There's very little of the ladder actually touching the fascia board." Mr. Conger's son believed that Mr. Johnston's son made a similar comment to Mr. Johnston, but Mr. Johnston's son stated that he made no such comment to his father. In response to the warning, Mr. Conger's son testified that Mr. Johnston said "he thought he would be all right."

Mr. Johnston testified that he did not hear his son or Mr. Conger's son warn him before he began to ascend the ladder. He did agree on cross-examination, however, that he said "it would be all right" in response to a comment made by one of the other men:

MR. CONGER'S ATTORNEY: Now, are you saying, sir, that you made no response to anybody's comments about the placement of the ladder that it will be all right?

MR. JOHNSTON: I believe I asked it and I said it would be all right.

MR. CONGER'S ATTORNEY: Who did you say that to?

MR. JOHNSTON: I don't know, Mr. Conger, my son, or [Mr. Conger's son].

MR. CONGER'S ATTORNEY: So somebody had pointed out something about the ladder to you that you were responding to?

MR. JOHNSTON: Evidently.

Mr. Johnston further stated that he tested the ladder to make sure it was steady by jumping up and down on the bottom rung. Mr. Conger could not recall Mr. Johnston doing that. Mr. Conger's son believed Mr. Johnston investigated only to be sure the ladder would not fall to the right.

Mr. Johnston ascended the ladder and was on it for approximately one minute before the ladder slid off the fascia board. The top of the ladder fell toward the house, and Mr. Johnston fell to the ground.

On March 30, 1989, Mr. Johnston and his wife, Dorothy, filed suit against Mr. Conger for the injuries Mr. Johnston sustained as a result of his fall from the ladder. Mr. and Mrs. Johnston contended in their petition that Mr. Johnston's fall and subsequent injuries were "the direct and proximate result of the negligence of [Mr. Conger] in failing to properly hold the ladder as he assured [Mr. Johnston] he would do or, in the otherwise, [sic] warn [Mr. Johnston] that he was in fact not going to hold the ladder." Mr. Johnston alleged "permanent and disabling injuries" to his lower back, leg, and heel resulting in his present and future physical disability. Mrs. Johnston alleged the loss of Mr. Johnston's services and consortium.

In early April of 1989, Mr. Conger filed his answer to the Johnstons' petition. In his answer, Mr. Conger alleged a number of ways Mr. Johnston was negligent, including allegations that Mr. Johnston failed to give adequate instructions to Mr. Conger regarding holding the ladder, that he placed the ladder against the fascia board in a negligent manner, that he failed to heed the warnings of those present, and that he failed to test the ladder's stability before beginning to hang the guttering.

Because Mr. Johnston claimed physical disability from the accident, Mr. Conger exercised his right to have Dr. Victoria S. Cook, M.D., examine Mr. Johnston. On April 13, 1989, Dr. Cook issued a twelve-page report detailing her conclusions and opinions. As she expressed in later depositions, Dr. Cook found that Mr. Johnston had "a severe addiction to alcohol" to the extent that within a couple of days of having his alcohol consumption cut back during his hospital stay following the accident, Mr. Johnston experienced delirium tremens. Dr. Cook stated that Mr. Johnston's alcohol addiction was so serious that he was probably in his best overall condition when he was drunk or under the influence of alcohol. Any other condition would be a state of withdrawal, which would be accompanied by "trembling, headaches, confusion, agitation, impairment in concentration, difficulty remembering things, problems with balance, and so forth." Dr. Cook noted that with heavy daily drinkers, the early stages of withdrawal will be apparent

by the time they sleep off their last consumption of alcohol, such that when a heavy drinker wakes up, he will show some shakiness, trembling, memory difficulty, agitation, and impaired concentration. Dr. Cook testified that she could say to an absolute degree of medical certainty that Mr. Johnston was either under the influence of alcohol or suffering from alcohol withdrawal at the time of the accident. Dr. Cook further opined that Mr. Johnston was physically unable to do his job safely even before the April 4, 1987, accident.

On November 5, 1991, the Johnstons filed a motion in limine. They sought a court order prohibiting the introduction of any evidence or comment by Mr. Conger, his attorney, or any witness in the presence of the jury regarding any consumption of alcohol by Mr. Johnston at the time of the accident, the possibility that Mr. Johnston was suffering from alcohol withdrawal or impairment at the time of the accident, and the existence of medical bills not related to Mr. Johnston's injuries but incurred because of his alcohol dependency.

Prior to trial, the trial court made several rulings related to Dr. Cook's deposition, ultimately allowing counsel to edit her deposition for the purpose of displaying it to the jury by video tape. The trial court noted while hearing pretrial motions that its rulings allowing Dr. Cook's deposition testimony pertaining to Mr. Johnston's condition at the time of the accident and during his hospitalization had the effect of making its ruling on the Johnstons' motion in limine an evidentiary ruling by the court.

The case proceeded to trial before a jury on November 12, 1991. During the hearing, the jury viewed the videotaped deposition of Dr. Cook. At the conclusion of the trial, the jury returned a verdict in favor of Mr. Conger, assessing 100% of the fault against Mr. Johnston. On December 2, 1991, the Johnstons filed a motion for new trial, which the trial court overruled on February 20, 1992. The Johnstons appeal from the order of the trial court entering judgment on the jury verdict in favor of Mr. Conger and from the order of the trial court overruling their motion for a new trial.

## I.

The Johnstons contend as their first point on appeal that the trial court erred in overruling their motion in limine and their objections at trial directed at Dr. Cook's testimony that Mr. Johnston was either under the influence of alcohol or suffering from alcohol withdrawal at the time of the accident and Dr. Cook's description of the symptoms experienced by alcoholics and people suffering from alcohol withdrawal. The Johnstons argue that Missouri law is clear that before evidence of alcohol intake becomes admissible, evidence to support an inference of erratic behavior and evidence that the erratic behavior caused the accident must be presented. In addition, the Johnstons claim that Dr. Cook's testimony was inadmissible because her opinion was contrary to all eyewitness testimony of Mr. Johnston when the accident occurred and was without foundation. The Johnstons contend that Dr. Cook's testimony was irrelevant because Mr. Conger neither pleaded that Mr. Johnston was negligent because of intoxication nor did Mr. Conger offer an instruction for the jury to find that he was.

Apart from any possible relevance to a question of negligence, evidence of the intoxication of a witness is relevant and material to the witness's ability to see, hear, perceive, and observe. *Spencer v. Crawford*, 687 S.W.2d 243, 245 (Mo.App. 1985). "The intoxication of a witness as of the time the events took place which are the subject of the witness's testimony is not a collateral issue but bears directly upon the ability of the witness to accurately describe those events." *State v. Caston*, 509 S.W.2d 39, 41 (Mo.1974). Evidence of intoxication relates to the *credibility* of a witness regarding what transpired on the occasion in question and is admissible by either cross-examination or by separate and independent testimony. *Caston*, 509 S.W.2d at 41; *Spencer*, 687 S.W.2d at 246.

Mr. Johnston testified as to his version of the events surrounding the April 4,

1987, accident. In several areas, his testimony differed with that given by the other witnesses to the accident. Mr. Johnston claimed that he asked Mr. Conger to hold the ladder and gave him specific instructions on how to do it. Mr. Conger and the two sons testified that they heard neither a request nor any instructions. Mr. Conger's son claimed that he warned Mr. Johnston about the ladder's position on the fascia board. Although he admittedly responded, "[I]t will be all right," to something one of the other men noted about the ladder, Mr. Johnston claimed no one warned him that the ladder was barely touching the fascia board. Mr. Johnston stated that he tested the ladder to make sure it was steady by jumping up and down on the bottom rung. Mr. Conger did not recall Mr. Johnston doing that. Any possible impairment of Mr. Johnston's ability to recall what happened that day is relevant to his credibility as a witness.

■ Evidence of alcoholism is also admissible in claims involving permanency of injury. *Spencer,* 687 S.W.2d at 246. In his petition, Mr. Johnston alleged "permanent and disabling injuries" to his lower back, leg, and heel, resulting in his present and future physical disability. Thus in addition to being relevant to his credibility as a witness, Mr. Johnston's possible alcoholism was relevant to determining the permanency of his injuries.

■ The Johnstons contend that Dr. Cook's testimony was inadmissible because her opinion was contrary to all eyewitness testimony and was without foundation.

They argue that none of the eyewitnesses testified that Mr. Johnston was drinking or appeared to be affected by alcohol that day.

Dr. Cook's opinion does not suggest that Mr. Johnston was drinking on the day of the fall. Rather, Dr. Cook asserted that Mr. Johnston was physically and mentally impaired the day of the accident. She stated she could say with absolute medical certainty that Mr. Johnston was either under the influence of alcohol or suffering from alcohol withdrawal at the time of the accident. She based her assertion on her examination of Mr. Johnston and his medical records, including those records detailing the extent and severity of the delirium tremens he experienced.[1]

Dr. Cook's testimony was supported by Mr. Johnston's testimony and that of his own treating physician. Mr. Johnston admitted at trial that he normally consumed five to six beers every evening and had done so the night before the accident. Mr. Johnston's treating physician testified that Mr. Johnston was an alcoholic and that some of the medical care Mr. Johnston received during his hospitalization following the accident was treatment of the alcohol withdrawal symptoms (delirium tremens) he experienced. Dr. Cook's testimony was not without a foundation.

■ The decision to admit or exclude expert testimony is left to the sound discretion of the trial court. *Dine v. Williams,* 830 S.W.2d 453, 457 (Mo.App.1992). The trial court did not abuse its discretion by allowing Dr. Cook's testimony.

**1.** The Johnstons cite *Frye v. Meramec Marina, Inc.,* 673 S.W.2d 451 (Mo.App.1984), in support of their position. In *Frye,* the plaintiff filed a motion in limine requesting that the defendants be prohibited from presenting evidence that Frye's girlfriend told the hospital that he "drank a case of beer a day and ... some hard liquor" and that Frye was suffering from alcohol withdrawal in the hospital after the accident. *Id.* at 452–53. The motion alleged that this evidence was inadmissible because it did not "relate to his intoxication or lack of it at the time this incident occurred." *Id.* at 453. The trial court overruled the motion in limine, but the appellate court found that the evidence referred to in the motion in limine was inadmissible, citing a Missouri Supreme Court opinion which held

that a plaintiff's "general reputation for sobriety" was inadmissible upon the issue of the plaintiff's intoxication at the time of an accident involving the plaintiff. *Id.* (citing *Rhineberger v. Thompson,* 356 Mo. 520, 202 S.W.2d 64, 71 (Mo. banc 1947)).

*Frye* is distinguishable from this case. In the case at bar, Mr. Conger presented evidence through Dr. Cook that the severity of the delirium tremens suffered by Mr. Johnston indicated that he had "a very serious alcohol problem" and that he was physically and mentally impaired at the time of the accident. Furthermore, the evidence was not offered as evidence of Mr. Johnston's character or "general reputation for sobriety."

■ Moreover, the Johnstons can not complain on appeal that the jury should not have heard Dr. Cook's testimony. "A party who has conveyed information to a jury during its opening statement or who has introduced evidence concerning a certain fact may not on appeal complain that his opponent was allowed to introduce related evidence in rebuttal or explanation." *Boyer v. Eljer Mfg., Inc.*, 830 S.W.2d 535, 537 (Mo.App.1992). Upon the failure of the trial court to grant their motion in limine, the Johnstons first brought the issue of Mr. Johnston's possible alcohol-induced impairment into the trial. The Johnstons' counsel mentioned it in his opening statement [2] and presented evidence of it during the case in chief.[3] Point one is denied.

## II.

■ As their second point on appeal, the Johnstons allege that the trial court erred in submitting Mr. Conger's comparative fault instruction, Instruction No. 9, to the jury. Instruction No. 9 stated:

In your verdict, you must assess a percentage of fault to Plaintiff Hiram Ben Johnston whether or not Defendant Glenn Conger was partly at fault, if you believe:

First, either:

Plaintiff Hiram Ben Johnston failed to give adequate instructions to Defendant Conger regarding how to hold the ladder, or

Plaintiff Hiram Ben Johnston placed the ladder against fascia board in such a manner so that he knew or should have known it was unstable when in use.

Second, Plaintiff Hiram Ben Johnston was thereby negligent, and

Third, such negligence of Plaintiff Hiram Ben Johnston directly caused or directly contributed to cause any damage Plaintiff Hiram Ben Johnston may have sustained.[4]

The Johnstons assail the instruction for two reasons. They argue that (1) the instruction was not supported by the evidence and (2) that it omitted the word "and" between the first and second paragraphs, thereby deviating from MAI and entitling them to a new trial.

■ The issues of whether the evidence was sufficient to support the submission of Instruction No. 9 and the effect of the omission of the conjunctive "and" between paragraphs first and second need not be addressed. Error in giving a comparative fault instruction or error within the comparative fault instruction is harmless when the jury apportioned no percentage of fault to the defendant. *Lee v. Mirbaha*, 722 S.W.2d 80, 83–84 (Mo. banc 1986); *Vasseghi v. McNutt*, 811 S.W.2d 453, 455 (Mo. App.1991). In this case, ten of the twelve jurors signed Verdict A assessing 0% of the fault to Mr. Conger and 100% of the fault to Mr. Johnston. Any instructional error in Instruction No. 9 was harmless. Point two is denied.

**2.** The Johnstons' counsel made the following assertions during his opening statement to the jury:

Now Dr. Cook will also talk about the effect based upon her review of the hospital records, which will be in evidence for you to see yourselves. That on the basis of her examination of those hospital records, [Mr. Johnston] was suffering from delirium tremens while he was in St. Joseph Health Center. The DT's. That he was having alcohol withdrawal. And she will tell you that the first indication of any problem with alcohol was three days after this accident occurred. And that at that point [Mr. Johnston] became confused and agitated. And that he started exhibiting signs of alcohol withdrawal.

Dr. Cook will also try to suggest to you that on the basis of that fact that she can tell you,

and I think her words are 'with absolute certainty' that on the day of this fall, [Mr. Johnston] was either impaired, that is under the influence of alcohol, or would have been suffering from subacute alcohol withdrawal, which would have resulted in some shakiness, or maybe his balance might have been affected, or something of that nature.

**3.** During a videotape deposition shown to the jury, counsel for the Johnstons asked Mr. Johnston's physician, "What I am trying to ask specifically, rather than beat around the bush, you understand Mr. Johnston was an alcoholic?" Mr. Johnston's doctor replied, "Yes."

**4.** The instruction cites M.A.I. 37.02 (1986 New).

The judgment of the trial court is affirmed.

All concur.